**Kenneth PATE and Corrine Pate, husband and wife, Plaintiffs,**

**v.**

**COLUMBIA MACHINE, INC., a Washington Corporation, Defendant.**

**Civ. No. 94–0145–S–BLW.**

United States District Court, D. Idaho.

Feb. 15, 1996.

Joseph M. Coughlan, Coughlan & Coughlan, Boise, ID, Richard S. Owen, Nampa, ID, for plaintiffs.

Hugh Mossman, Boise, ID, J. Kevin West, Hall Farley Oberrecht & Blanton, Boise, ID, John R. Potter, Stephen G. Leatham, Heurlin & Potter, Vancouver, WA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WINMILL, District Judge.

The Court held a bench trial in this matter that concluded on January 11, 1996. After examining all the testimony and documents admitted into evidence at that trial, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## I.

## FINDINGS OF FACT

### A. *The S32 Splitter.*

1. The S32 Splitter is a machine designed to split concrete blocks.

2. The S32 Splitter was manufactured by Defendant Columbia Machine Inc., and shipped to Pumice Products in June 1976.

3. Columbia is a Washington corporation located in Vancouver, Washington.

4. Builders Masonry, located in Meridian, Idaho, bought Pumice Products in 1987, and continued to use the S32 Splitter to split concrete blocks.

5. Builders Masonry attaches the S32 Splitter to the end of the concrete block production line whenever certain types of blocks require splitting. The splitting of the blocks is the final stage of the production process. That process begins when concrete is poured into molds in a block machine. The blocks would then be taken to a kiln for curing. Once the blocks have hardened, they are ready to be split.

6. The blocks requiring splitting are sent by a long conveyor to the S32 Splitter. The Splitter is about 12 feet in length. It is mounted on a frame supported by wheels so that it can be moved into the production line when blocks need to be split and out of the line when no splitting is required.

7. When the Splitter is moved into the production line, its infeed end connects to the conveyor bringing blocks from the kiln. Steel guides are mounted on the conveyor to direct the unsplit blocks to the inlet of the Splitter where the blocks are then confined by side rail guides on the Splitter itself.

8. As a block enters the Splitter, it passes onto the top surface of a chain transport system consisting of a series of parallel, power driven, flat chains that contact the underside of the block. The friction between the chain drive and the block propels the block forward toward the splitting blades. At no time does this chain drive hook into or connect with the block in any way. The chain drive is depicted in Exhibit 17.

9. The chain drive is a little over four feet in length. As the block reaches the end of the chain drive it passes over two "limit switches" that control the Splitter's operation. The Court will describe the limit switches in more detail later in this decision.

10. Assuming that the limit switches allow the block to proceed, it will pass over the chain drive and come to rest on the surface of a skate conveyor. This skate conveyor consists of a series of rollers mounted flush with the surface and contacting the underside of the block. The skate conveyor is not power driven and does not connect in any way with the block. The block simply rests on the surface. A depiction of the chain drive leading up to the skate conveyor can be seen in Exhibit 17.

11. Once on the skate conveyor, the block slows and comes to a rest since it is no longer being propelled by any force except for the momentum it has coming off the chain drive. While the block is resting on the skate conveyor, a pusher mechanism consisting of four steel "fingers" moves upward from beneath the table surface, contacts the rear of the block, and propels the block forward into the splitting area. Once the fingers have pushed the block into the splitting area, the fingers move back to their "home" position, resting just beneath the surface where the chain drive ends and the skate conveyor begins. The fingers in their home position are depicted in Exhibit 19.

12. For the purposes of this case, the blocks are split in half and a V-shaped cut is made in either side of the block. Thus, the fingers are positioned to push the block into position in the splitting area so that a fixed blade can split the block in the middle.

13. The splitting mechanism consists of two blades run by an hydraulic cylinder. The blades are depicted in Exhibit 28. When the block is in position, the first, or top, blade comes down and contacts the top of the block. The function of this blade is not to split the block but instead to provide a counteracting force allowing the second, or bottom, blade to do the actual splitting. When the top blade has come down and is in position, the bottom blade then comes up from beneath the block and provides the force necessary to split the block.

14. When the split is complete, the blades return to their home position. The block is now split and sitting in the cutting area waiting to be moved out. Once the split is complete, and the blades have retracted, there is nothing holding the block in place.

15. At this point, another block is pushed into the splitting area by the four steel fingers. The action of the fingers pushing this new block into the splitting area propels the split block out of the splitting area onto the outfeed table depicted in Exhibits 8, 24, and 26. The outfeed table is 51 inches long measuring from the blades to the end of the table.

16. As the Court discussed earlier, the operation of the Splitter is governed in part by two limit switches located where the chain drive meets the skate conveyor. These limit switches are depicted in Exhibit 19, and are thin metal arms that extend above the surface of the Splitter, away from the direction of the block's progress. Thus, when the block passes over the switch, the block's forward progress is not affected, and the switch is depressed below the surface of the Splitter.

17. As the block passes over the chain drive, the first limit switch it encounters is limit switch 10. The block passes over limit switch 10, depressing it. If the four steel fingers are not in their home position, the depression of limit switch 10 will immediately shut off the chain drive. This is to avoid a dangerous situation where blocks continue to be fed onto the skate conveyor even before the four fingers have moved the block already on the skate conveyor into the splitting area.

18. Just a few inches beyond limit switch 10 is limit switch 7. When the block passes over limit switch 7, depressing it, nothing in the operation of the Splitter is affected. It is only when the block passes over limit switch 7, and the switch pops back up, that the four steel fingers are triggered to begin their cycle of moving up and pushing the block into the splitting area.

19. The end tip of limit switch 10 is located about 41 inches from the center line of the cutting blades, and the end tip of limit switch 7 is located about 37 inches from that center line. There was some testimony from defense expert Peter Schwalje that the end tip of limit switch 7 was only 30 inches from the

blades' center line. But Plaintiffs' counsel pointed out, with the help of drawing number one attached to exhibit two, that Schwalje was mistaken. It appears that Schwalje only measured to the end of the infeed conveyor tray; drawing number one shows clearly that the end of that tray is still several inches short of the blades' center line.

20. The Splitter has a control panel with an emergency shut off switch. This control panel is located along one side of the Splitter, in the middle of the chain drive area.

21. On the side of the Splitter opposite from the control panel is a manual feed button. When pressed, this button will cause the four steel fingers to run through one cycle of extending, pushing a brick into the Splitter, and retracting. The Splitter then stops until the manual feed button is pushed again, allowing the fingers to run through one more cycle.

22. On the same side as this manual feed button is a warning label affixed to the surface of the Splitter and reading in large red letters, "WARNING," underneath which is the following: "THIS MACHINE IS AUTO-MATICALLY CONTROLLED. IT MAY START AT ANY TIME."

### 1. Jamming of Blocks on the S32 Splitter.

23. When Pumice Products first started using the Splitter in 1976, there were problems with blocks jamming and not flowing freely into the splitting area. Paul Mason, now the Vice–President of Manufacturing for Builders Masonry, but previously with Pumice Products, testified that from the very day the Splitter was first set up there were block jams. Mason testified that he consulted with a Columbia salesman named Manny Helm in 1976 about curing the jamming problem.

24. In the 1970s, the jams were generally caused by either defective blocks with jagged edges or by a type of block known as the eight inch split face block. This block would cause jams about six to eight times a day in the 1970s. The jams would occur most frequently when the Splitter was first set up because it would take awhile to get the guides adjusted to the right width. The jams frequently occurred where the conveyor bringing blocks from the kiln meets the Splitter's chain drive. Later, after the Splitter had been running for an hour or so and the guides were adjusted correctly, the jams would often occur in the area of the limit switches 7 and 10. Paul Mason testified that jams often occurred in the area depicted in Exhibit 16 which shows limit switches 7 and 10.

25. When the S32 Splitter was manufactured in 1976, it was an automatic machine requiring operation by, at most, a single worker who would clear jams and make sure the machine operated properly. In 1976 there was no need for two workers to operate the machine.

### 2. Introduction of the Keystone Block.

26. Sometime in the 1980s, a number of companies started making a retaining wall block that needed not only to be split in half, but also to have a V-shaped split taken out of each side of the block.

27. One type of this block was known as the Keystone block. It is an eight-sided block depicted in exhibit 7. As shown in that exhibit, the Keystone block required the cutting blade to slice a V-shaped cut out of each side of the block.

28. Columbia began manufacturing a special blade to make the V-shaped cuts for Keystone blocks in the 1980s.

29. Builders Masonry started running Keystone blocks through the S32 Splitter beginning in the 1980s. Builders Masonry used their own blade, made by a local machine shop to the specifications of Builders Masonry.

30. The number of block jams per day did not go up with the introduction of Keystone blocks. The Keystone blocks jammed at the same rate as any other type of block.

31. The Keystone block did, however, cause a change with regard to the number of workers now needed to work at the Splitter. The Keystone blocks would sometimes emerge from the Splitter's cutting area with only a partial V-shaped cut. This meant that a worker needed to be stationed on either side of the outfeed table to make sure the V-

shaped cut was made. If the Splitter did not make a full cut, the workers would use a mallet and chisel to complete the cut, and would then clear away the resulting debris.

### B. Plaintiff Kenneth Pate.

32. Plaintiff Kenneth Pate was born on October 4, 1938.

33. Builders Masonry hired Pate on June 22, 1992 as a laborer to build wooden pallets for $6.50 an hour.

34. While Pate was building pallets, he worked outside the Builders Masonry plant. But starting on August 18, 1992, he was assigned to go into the plant to relieve workers who were taking breaks.

35. When relieving these workers, Pate would stand at the outfeed table of the S32 Splitter and use a mallet and chisel to clean up any ragged cuts made by the Splitter.

36. At that time, in August, 1992, the blocks being split were eight inch Keystone blocks.

37. There was conflicting testimony given at trial concerning the warnings given to Pate before he started working with the eight inch Keystone blocks on August 18, 1992. Paul Mason testified that before Pate began working on the eight inch Keystone blocks, he (Mason) warned Pate that he should keep his hands out of the blades; that any jams were to be cleared by the operator, not by Pate, and only after the Splitter had been turned off; that Pate was not to place his hands anywhere on the upstream side of the blades unless the machine was turned off; and, perhaps most importantly given the way Pate was ultimately injured, that he should not get his hands between two blocks.

38. Pate disputes Mason's account and claims that he was told only to keep his hands out of the blades, and that the Splitter should be turned off before anyone reached into the blades.

39. Throughout this trial, Pate's recollections of the events surrounding August/September 1992 were vague. On the other hand, the testimony of Paul Mason was firm. Under all these circumstances, the Court adopts the testimony of Paul Mason over that of Pate on the warning issue.

40. Pate testified that he worked on the Splitter on two occasions prior to his accident on September 2, 1992. On both of these occasions he was working at the outfeed table of the Splitter, using the mallet and chisel to knock off the jagged edges of the block. He estimates that he worked one day for two or three hours and the other day for about half of the day.

41. There was no evidence that the S32 Splitter had caused any personal injury to any worker at Builders Masonry or Pumice Products between the date that the Splitter was first installed in 1976 and the date of Pate's accident, September 2, 1992.

### C. The Day of the Injury.

42. Prior to September 2, 1992, Builders Masonry had been running eight inch Keystone blocks through the Splitter. During that time, Builders Masonry had been pouring and curing four inch Keystone blocks which were, by September 2, 1992, ready to be split. Steve Mason, the plant superintendent, adjusted the Splitter to handle the four inch Keystone blocks at about 1:00 p.m. on September 2, 1992.

43. Pate had not previously worked with four inch Keystone blocks. Pate testified that he watched Steve Mason set up the Splitter to handle the new blocks.

44. Each unsplit four inch Keystone block weighed about 90 pounds.

45. There is a conflict in the testimony over whether Steve Mason gave certain warnings to Pate. Pate's recollection is that, at most, Mason only told him to keep his hands out of the blades and turn off the machine before reaching into the blades. Steve Mason's recollection is quite different. Mason recalls specifically warning Pate not to do anything on the infeed side of the blades without having someone turn the Splitter off first. Mason recalls that as he was setting up the machine and giving these warnings to Pate, there were one or two jams in the area of the limit switches 7 and 10. Mason recalls turning off the machine, and then using a pinch bar—a type of long

crow-bar—to move the blocks and free the jam.

46. Once again, the Court is more impressed with the testimony of Steve Mason on this issue than with the testimony of Pate for reasons expressed previously. The Court therefore finds that Steve Mason did convey the warnings described above to Pate.

47. The set up of the machine took about half an hour and then there was another five or ten minutes to run the machine and get the guides adjusted.

48. Sometime around 2:00 p.m. on September 2, 1992, the S32 Splitter started splitting four inch Keystone blocks.

49. Pate was working on the outfeed table using the mallet and chisel to complete the cuts left unfinished by the Splitter. Working across from him on the other side of the outfeed table was Chip Swears who was doing the same task.

50. Swears was the operator of the machine, and was working on the same side as the control panel. According to the warnings given by the Masons to Pate, Swears was the only one authorized to clear jams. Because of the great noise in the plant, both Swears and Pate were wearing ear plugs and ear muffs. In addition, both were wearing goggles and hard hats, and Pate was wearing gloves.

51. With regard to the events of the injury itself, the Court adopts the testimony of Dr. Richard Gill, an expert in mechanical engineering and accident reconstruction. While the Court recognizes that there are discrepancies between Pate's deposition testimony and Dr. Gill's testimony, the Court finds that Pate's deposition version of the injury is physically impossible. Pate's testimony indicated that he has a poor memory of the actual events due, perhaps, to the devastating trauma of the accident. Dr. Gill's testimony, on the other hand, is consistent with the undisputed physical facts. The Court therefore finds that Dr. Gill's reconstruction of the accident is the most accurate and reasonable account of the injury.

52. Between the time that Pate started working at the Splitter on September 2, 1992 at 2:00 p.m., and 4:00 p.m., there had been no jammed blocks. But at 4:00 p.m. a block jammed in the vicinity of limit switches 7 and 10 by wedging tightly against the side guard rails.

53. The jammed block had passed over limit switch 10 but was depressing limit switch 7. At this moment, as the jammed block depressed limit switch 7, the four steel fingers were in their home position.

54. Pate, working at the outfeed table, saw the jam and yelled at operator Chip Swears to turn off the Splitter.

55. The Splitter was never turned off.

56. Pate walked over to the jam, and grabbed the jammed block with his left hand on the downstream, or leading, edge. Pate's left hand was now about five and one-half inches from the upstream, or trailing, edge of a split block that was in the splitter area waiting to be pushed into the outfeed area.

57. Pate rotated the jammed block so that it was no longer wedged against the side guard rails. In rotating the jammed block, Pate moved the block so that it was no longer depressing limit switch 7.

58. With this movement, limit switch 7 popped up, activating the four steel fingers which contacted the upstream, or trailing, edge of the formerly jammed block.

59. At the time the four steel fingers contacted the trailing edge of the block, Pate's left hand was still grabbing the leading edge of the block.

60. The four steel fingers then pushed the unsplit block into the split block already in the splitting area, trapping Pate's left hand between the two blocks.

61. Approximately 1.3 seconds elapsed between the time that the four steel fingers were activated and the time the unsplit block rammed into the back of the split block, trapping Pate's hand.

62. The four steel fingers continued to push the block into the splitting area as Pate struggled unsuccessfully to pull his hand from between the blocks.

63. When the unsplit block was pushed into the splitting area, Pate's left hand was squeezed between the unsplit block and the

top blade. Some of the fingers on Pate's left hand were crushed while the remainder were pulled off.

64. Dr. Troy Watkins, an orthopedic surgeon who treated Pate on the night of the accident, saw the severed fingers and testified that they appeared to have either been crushed or pulled off. Dr. Watkins testified that Pate's attempts to pull his hand out while the fingers were securely trapped may have contributed to the result.

65. The court finds that the five fingers of Pates left hand were either crushed or pulled off by the combination of being squeezed between the unsplit block and the top blade, and by the force exerted by Pate in attempting to free his hand.

66. Doctors later transplanted the big toe on Pate's right foot to his left hand to act as a thumb. Dr. Watkins, who performed the surgery, testified that the result is an improvement over a hook. Nevertheless, the improvement is minimal. Pate still has almost no pinching ability.

67. This accident has made it nearly impossible for Pate, a laborer used to working with his hands, to find any work. He has suffered from pain and the anguish caused by having a deformed hand. His marital relations with his wife have been disrupted, and he has experienced serious depression. The Court has little difficulty finding that the accident and its aftermath have been devastating to him.

## II.

## CONCLUSIONS OF LAW

### A. Jurisdiction.

1. The Court finds that it has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) in that the Plaintiffs and Defendant are citizens of different States, and the matter in controversy exceeds the sum of $50,000, exclusive of interest and costs.

### B. Strict Liability.

#### 1. Definition of Defective Product.

2. In 1974, Idaho adopted the rule of strict liability in products liability litigation.

*See, Shields v. Morton Chemical Company,* 95 Idaho 674, 518 P.2d 857 (1974). *Shields* adopted the rule of strict liability set forth in the Restatement (Second) of Torts, § 402A (1965) which provides as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(A) the seller is engaged in the business of selling such a product, and

(B) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

3. "A product is in a defective condition, unreasonably dangerous to person or property if it is more dangerous than would be expected by an ordinary person who may reasonably be expected to use it." *See,* Idaho Pattern Jury Instructions (IDJI) # 1007 (1988).

4. A "defect" could occur in either the manufacture or design of a product. *See, Rindlisbaker v. Wilson,* 95 Idaho 752, 519 P.2d 421 (1974).

5. A failure to warn may be the basis for liability in strict liability. A product is in a "defective" condition for strict liability purposes "where the defendant has reason to anticipate that danger may result from a particular use of his product and he fails to give adequate warnings of such a danger." *See, Watson v. Navistar Intern. Transp. Corp.,* 121 Idaho 643, 660, 827 P.2d 656, 673 (1992) (quoting from *Mico Mobile Sales & Leasing, Inc. v. Skyline Corp.,* 97 Idaho 408, 414, 546 P.2d 54, 60 (1975)).

6. The absence of prior accidents is relevant evidence in a products liability action. *See, Henderson v. Cominco American, Incorporated,* 95 Idaho 690, 699, 518 P.2d 873, 882 (1973); *See also, 2 American Law of Products Liability,* ¶ 17.80 at p. 101 (1987) ("The more widely-held view is that ... evidence [of the absence of accidents] is admissible" in product liability actions.).

### 1(a). Lack of Guard as a Design Defect.

7. Pate claims that the S32 Splitter was unreasonably dangerous because it lacked a guard that would have prevented Pate's injury. Pate claims that the guard should have covered the skate conveyor area in the vicinity of limit switches 7 and 10. Pate asserts that the standards for guarding compiled by the American National Safety Institute (ANSI), and contained in Exhibits 41 and 42, apply to the S32 Splitter and require guarding.

8. The ANSI guarding standards set out in Exhibits 41 and 42 are not designed to prevent the type of injury suffered by Pate. Those ANSI standards are designed to prevent "inadvertent physical contact with conveying equipment, power transmission equipment, prime movers, machines or machine parts which could result from slipping, falling, sliding, tripping, or any other unplanned action or movement." *See,* Exhibit 42 at ¶ 5.14.1.1; *See also,* Exhibit 41 at ¶ 6 (" 'Guarded' means shielded . . . or otherwise protected . . . so as to remove foreseeable risk of personal injury from *accidental contact or approach . . . .*").

9. Pate's conduct in clearing the jam was intentional; it was the consequence of that act that was unintended. This type of situation is not covered by ANSI. As the Court reviewed the types of guards mandated by ANSI, it is apparent that they are not designed to prevent a worker from intentionally gaining access, but instead designed to prevent inadvertent contact with dangerous parts of the machine. In this case, workers had to have access to clear jams, and no guard could have been placed over the fingers to prevent the trapping force that caused Pate's injury. The guarding provisions of ANSI do not cover the situation faced in this case.

10. Even if ANSI was applicable, it would not change the result in this case. No ANSI standard in Exhibits 41 and 42 requires a fixed or immovable guard over the skate conveyor area. At most, a hinged or retractable guard would be required to allow the operator access to the blocks to clear jams. *See,* Exhibit 41 at ¶ 8.6; Exhibit 42 at ¶ 5.14.1.2. And as the Court will discuss later in this opinion, the lack of such a retractable guard could not have been a proximate cause of Pate's injury.

11. Pate's counsel noted during closing argument that the guard should be hinged so that it could only be opened from the control panel side, and/or that the guard should be connected to the shut off switch so that the machine would automatically stop whenever the guard was retracted. Pate's counsel did not point the Court to any expert testimony concerning such a guard, and did not refer to any ANSI standard that would require such a guard. In the absence of such evidence, the Court is left to speculate as to the feasibility, cost, function, availability, and suitability of such modifications to the machine. In short, the Court cannot find that the S32 Splitter is unreasonably dangerous because it lacked the guards described by counsel in closing argument.[1]

12. As the Court has reviewed all the evidence, the Court finds that the S32 Splitter was not defective or unreasonably dangerous because it failed to have a guard.

### 1(b). Lack of Second Shut Off Switch as a Design Defect.

13. The S32 Splitter had only one emergency shut off switch located on the control panel side of the machine. There was no shut off switch on the opposite side of the machine.

14. The S32 Splitter was not designed to be an unmanned machine. It was foreseeable, and in fact well-known, that the blocks, heavy and rough-edged, often jammed in the Splitter, and had to be cleared by human intervention. At least one worker was need-

---

1. The Court would also point out that later in this opinion, the Court finds that the lack of a second shut off switch was a design defect that was one substantial factor in causing Pate's injury. A system that would automatically shut off the machine when a hinged cover is retracted—as advocated by Pate's counsel—is really more of an elaborate shut off mechanism than a guard. Since the Court is finding that the Splitter's shut off system was defectively designed, the Court is essentially reaching the same result as advocated by counsel, but using different reasons for reaching that conclusion.

ed to be stationed at the Splitter to clear jams and clean away debris.

15. It was foreseeable and well-known that the Splitter operated in a noisy environment where shouted instructions might go unheard.

16. The Splitter allowed a worker to approach it from either side to clear a jam. The Splitter was not designed to necessarily be placed up against a wall, or otherwise set up in a manner that would restrict access to the side opposite the control panel.

17. It was foreseeable that a worker could approach the Splitter from the side without a shut off switch and proceed to attempt to clear a jam by hand while the Splitter was operating. This scenario—a worker using his own procedure to save time in an assembly line setting—is common knowledge in any industrial environment.

18. A second shut off switch on the side opposite the control panel would have permitted the worker to turn off the Splitter himself without having to either yell instructions to a co-worker on the control panel side to turn the machine off, or to take the time to walk around the machine to the control panel to turn it off. It would also permit workers on either side to immediately turn off the machine in the event of any type of emergency.

19. The Splitter contained very powerful hydraulic devices, and many moving parts. This combination of crushing power and grabbing forces makes it important for the worker to have an emergency shut off switch at each side where operations could occur.

20. Under these circumstances, the Court finds that the lack of a second shut off switch opposite the control panel was a defective design that rendered the Splitter unreasonably dangerous.

### 1(c). Lack of Warnings in Manual as a Design Defect.

█ 21. Pate asserts that the warnings in the Manual that was prepared by Columbia were defective. Pate presented the testimony of Dr. Gill that the Manual instructions did not adequately warn workers about the dangers of clearing jams.

22. The Manual does contain a large warning on its second page that reads in pertinent part as follows:

**WARNING**

**TO ALL PLANT PERSONNEL**

---

**THIS MACHINE IS**

**AUTOMATICALLY CONTROLLED**

**IT MAY START AT ANY TIME!**

---

**AVOID PERSONAL INJURY BY**

**TAKING EVERY PRECAUTION!**

---

1. Never perform adjustments when machine is operating.

2. Never remove defective products when machine is in automatic operation.

23. In addition, as discussed in the Findings of Fact, a warning was affixed to the surface of the Splitter itself warning workers that the machine could start at any time.

24. Under all these circumstances, the Court cannot find that the S32 Splitter was defectively designed because it had inadequate warnings.

### 2. Proximate Cause for Strict Liability Claim.

█ 25. To establish his strict liability claim, Pate must show not only that the S32 Splitter was defective, but also that the defect was the proximate cause of his injuries. "A finding of causation is imperative to any ruling holding one strictly liable in products liability, as it must be proved that the defect which is the subject of the litigation caused the injury or damage." *J.M.F. Trucking v. Lewiston Carb. & Elec.*, 113 Idaho 797, 799, 748 P.2d 381, 383 (1987).

26. Proximate cause is "a cause which, in natural or probable sequence, produced the damage complained of. It need not be the only cause. It is sufficient if it is a substantial factor concurring with some other cause

acting at the same time, which in combination with it, causes the damage." *Manning v. Twin Falls Clinic & Hospital,* 122 Idaho 47, 51, 830 P.2d 1185, 1189 (1992); IDJI # 230 (1988). The conduct of the manufacturer "need not be the sole factor, or even the primary factor, in causing the plaintiff's injuries, but merely a *substantial* factor therein." *Fussell v. Duane L. St. Clair, M.D.,* 120 Idaho 591, 595, 818 P.2d 295, 299 (1991) (quoting from *Fouche v. Chrysler Motors Corp.,* 107 Idaho 701, 704, 692 P.2d 345, 348 (1984)) (emphasis in original).

27. The "but for" test for proximate cause applies only in those cases where a single cause is responsible for the harm and there is no allegation that multiple causes contributed to the injury. *Fussell,* 120 Idaho at 595, 818 P.2d at 299. The "but for" test is therefore inapplicable here.

### 2(a). Lack of Guard as Proximate Cause of Injury.

■ 28. Assuming, *arguendo,* that the lack of a guard was a defect, the Court finds that this defect was not a substantial factor in causing Pate's injuries.

29. There was no testimony or evidence that a fixed or immovable type guard would have been appropriate. At most, the guard would have to be retractable to allow workers access to the blocks to clear jams. Such a retractable guard would have done nothing to stop Pate from reaching in to clear the jam.

### 2(b). Lack of Second Shut Off Switch as Proximate Cause of Injury.

■ 30. Having found that the lack of a second shut off switch was a design defect, the Court must determine whether this defect was a proximate cause of Pate's injuries.

31. A second shut off switch could have prevented the accident by allowing Pate to shut off the machine himself either before he cleared the jam, or after his hand became trapped.

32. A second shut off switch on Pate's side would not have helped once Pate's hand was trapped. The accident happened within a few seconds, and occupied all of Pate's attention and energy. During the 3 seconds or so that Pate was struggling, he was using his right arm to try to pull free his trapped left hand, and he was using his legs for stability and extra power. He had no time or opportunity to hit an emergency shut off switch with either his hands or his feet. Thus, the lack of a second shut off switch that could have been used as an emergency stop was not a substantial factor in Pate's injury.

33. But the Court does find that if Pate had been provided with a second shut off switch, he would have used it to turn off the Splitter *prior* to clearing the jam. Pate yelled at Chip Swears to turn off the machine, and thought it was off when he started clearing the jam. This indicates to the Court that Pate would have used a second shut off switch to turn off the machine before clearing the jam. Thus the lack of a second shut off switch was one substantial factor in causing Pate's injuries.

### 2(c). Lack of Warnings in Manual as Proximate Cause of Injury.

34. Even assuming the warnings in the Manual were inadequate, Paul and Steve Mason provided ample warnings to Pate that, if heeded, would have prevented this accident. In addition, Dr. Gill, Pate's expert, testified that he could not fault Builders Masonry for failing to show Pate the Manual. Any inadequacy of the warnings in the Manual was therefore not a proximate cause of Pate's injuries.

### 3. Comparative Responsibility and Strict Liability.

35. In 1971, the Idaho Legislature passed the Idaho Products Liability Act (IPLA), I.C. §§ 6–1401 to –1410. A provision of the IPLA—specifically, I.C. § 6–1404—provides that

[c]omparative responsibility shall not bar recovery in an action by any person or his legal representative to recover damages for product liability resulting in death or injury to person or property, if such responsibility was not as great as the responsibility of the person against whom recov-

ery is sought, but any damages allowed shall be diminished in the proportion to the amount of responsibility attributable to the person recovering.

36. The IPLA goes on to list "conduct affecting comparative responsibility" in the next section, I.C. § 6–1405. The list includes the following: (1) Failure to observe an obvious defective condition; (2) Use of a product with a known defective condition; (3) Misuse of a product; and (4) Alteration or modification of a product.

37. The Idaho Supreme Court has held that the comparative responsibility provisions of the IPLA are applicable to strict liability actions. *See, Vannoy v. Uniroyal Tire Co.*, 111 Idaho 536, 726 P.2d 648 (1985); 3 *American Law of Products Liability*, § 40:38 at p. 64 (1992) (listing Idaho as a jurisdiction that "appl[ies] comparative fault principles to strict liability actions.")

38. In addition, the Court in *Vannoy* held that the "policies underlying the practice of attributing responsibility to every alleged tortfeasor, *whether or not a party to the action*, are equally applicable to products liability actions based upon strict liability as well as actions based on negligence or other tort theories." *Id.* at 542, 726 P.2d at 654 (emphasis added).

39. The Court has found that the S32 Splitter was defectively designed because it did not have a second shut off switch opposite the control panel side of the machine, and that this design defect was one substantial factor causing Pate's injuries. Pate's own responsibility must now be examined, and then compared with the responsibility of Columbia and Builders Masonry under the IPLA.[2]

40. One factor affecting comparative responsibility under the IPLA is "misuse of the product." That provision, contained at I.C. § 6–1405(3), provides that Columbia has the burden of proving that Pate did "not act in a manner that would be expected of an ordi-

nary reasonably prudent person who is likely to use the product in the same or similar circumstances."

41. A second defense under the IPLA is the "obvious defect" defense. To establish this defense, Columbia must prove that "[Pate], while using the [Splitter], was injured by a defective condition that would have been obvious to an ordinary reasonably prudent person...." I.C. § 6–1405(1)(b).

42. A third defense is the "assumption of risk" defense. To establish this defense, Columbia must prove that Pate "knew about the product's defective condition, and voluntarily used the product or voluntarily assumed the risk of harm from the product...." I.C. § 6–1405(2)(a).

43. If the Court finds these defenses established, the Court must then allocate responsibility for the accident between Pate, Columbia and Builders Masonry. The IPLA provides that comparative responsibility "shall not bar recovery ... if such responsibility was not as great as the responsibility of the person against whom recovery is sought, but any damages shall be diminished in the proportion to the amount of responsibility attributable to the person recovering." I.C. § 6–1404.

44. Columbia has carried its burden of establishing the defenses of misuse of the product, obvious defect, and assumption of risk.

45. Pate was given warnings by Paul and Steve Mason that all jams were to be cleared by the operator, not by Pate, after the Splitter had been turned off. He was warned not to place his hands anywhere upstream of the blades unless the machine was turned off, and he was specifically warned by Paul Mason to avoid getting his hand caught between blocks. These warnings, if followed, would have prevented Pate's injuries.

46. Prior to the accident, Pate had worked with the Splitter twice. He saw how the fingers moved the heavy blocks very

---

2. Of course, Builders Masonry had nothing to do with the design and manufacture of the S32 Splitter in 1976. Nevertheless, *Vannoy* requires that all parties who may have "caused or contributed to the accident and injuries" must be on the verdict form regardless of whether a strict liability claim "would or could be rendered against that person." *Vannoy*, 111 Idaho at 543–44, 726 P.2d at 655–56.

quickly into the cutting area; the speed and power of the fingers would have been readily apparent. There was no hidden danger here. The combination of the warnings and his own observations put Pate on notice that the fingers had the potential to trap a hand between blocks.

47. Pate knew the plant was noisy, and that his shouts to Chip Swears might not be heard. The jam was not creating an urgent problem requiring Pate to abandon precautions for his own safety: The jam was not damaging blocks, causing them to fall off the conveyor, or otherwise creating a dangerous or emergency situation. There was also no evidence that Builders Masonry had put pressure on Pate or other employees to keep the line going during jams. Thus, Pate had the time and the opportunity to make sure that the machine was turned off by Chip Swears or by himself. These precautions could have been accomplished in a minute or two.

48. Columbia has carried its burden of proving the misuse of product defense set forth in I.C. § 6–1405(3), the obvious defect defense set forth in I.C. § 6–1405(1)(b), and the assumption of risk defense set forth in I.C. § 6–1405(2)(a).

49. In comparison, the responsibility of Columbia and Builders Masonry is minimal. Columbia's Manual provided a clear and prominent warning that the Splitter was to be shut off before any adjustments—a term that easily includes clearing jams—were made. Columbia did provide a shut off switch on one side of the Splitter, and provided another safety shut off device in the form of limit switch 10.

50. Columbia also offered its existing customers add-on shut off switches. The testimony of Gail Bridenbecker established that the add-on shut off switches depicted in exhibit 111 were marketed to customers including Builders Masonry, as shown on the Columbia mailing list, exhibit 127.

51. Builders Masonry elected to give verbal warnings to workers rather than purchase the add-on shut off switches. These verbal warnings were extensive, and were given—in Pate's case—on two separate occasions by two separate Builders Masonry supervisors. If those warnings had been heeded, the accident would not have occurred. There is no conclusive evidence that Builders Masonry altered or modified the S32 Splitter in any way that contributed to Pate's injuries. Although Builders Masonry did not show the Manual to Pate, even Pate's expert, Dr. Gill, testified that he could not fault Builders Masonry for that reason.

52. There is no evidence that Columbia and Builders Masonry had any notice of any incident where the S32 Splitter caused a personal injury in the 16 years between the Splitter's manufacture in 1976 and Pate's accident in 1992.

53. In assigning percentages of responsibility under I.C. § 6–1404 of the IPLA, the Court finds that Pate is 70% responsible for his own injuries; Columbia is 15% responsible; and Builders Masonry is 15% responsible.

## C. Negligence.

### 1. Negligence Claim Against Columbia.

54. Pate has two negligence claims against Columbia. First, he claims that the S32 Splitter was negligently designed for failing to have guards, a second shut off switch, and adequate warnings in the manual. Second, he asserts that Columbia violated an assumed duty to provide its existing customers with updated safety devices.

55. The analysis under Idaho law of these negligence claims differs from the analysis of the strict liability claims: "We note that an action based on strict liability focuses on the condition of the product after manufacturing and the consumer's expectation, and that an action based on negligence is concerned with the conduct and behavior of the manufacturer." *Tuttle v. Sudenga Industries, Inc.*, 125 Idaho 145, 868 P.2d 473 (1994). With this standard in mind, the Court will examine each of Pate's negligence claims.

### 1a. Columbia's Negligent Design.

56. "The manufacturer of a product is negligent if he does not use ordinary care

in the design of that product to avoid an unreasonable risk of foreseeable injury to a person using the product with ordinary care." *See,* IDJI # 1001 (1988).

57. The Court finds that the S32 Splitter was not negligently designed for failing to have guards or for failing to have adequate warnings in the Manual. There was no type of guard that could have protected against this accident, and the warnings in the Manual were sufficient.

58. The Court does find, however, that the S32 Splitter was negligently designed for failing to have a second shut off switch on the side opposite the control panel. Columbia knew of the power and grabbing potential of the Splitter, and knew that a worker could approach the machine from either side to clear a jam. It was foreseeable that a worker could attempt to clear a jam by hand while the machine was operating. A second shut off switch would have been an inexpensive way to permit a worker on either side to stop the machine, a substantial improvement in safety.

### 1b. Negligence of Columbia After 1976.

■■■ 59. Pate asserts that Columbia assumed a duty by providing updated safety devices like the add-on shut off switches, and therefore "voluntarily assumed the duty to provide their customers with current safety features and safety apparatuses...." *See,* Plaintiffs' Trial Brief at p. 8. Pate cites no product liability case holding that a manufacturer, by providing add-on safety devices to its existing customers, assumes some kind of continuing duty. This Court refuses to extend Idaho law beyond its present boundaries.

### 1c. Proximate Cause on the Negligence Claim Against Columbia.

60. The lack of a second shut off switch, a negligent design defect, was one substantial factor in causing Pate's injuries because the Court has found that Pate would have used this second shut off switch, if it had been available to him, to turn off the machine before he attempted to clear the jam.

### 2. Negligence Claim Against Builders Masonry.

■■■ 61. Builders Masonry was negligent for permitting operation of the S32 Splitter with workers on either side of the machine, but with no way for the worker on the side opposite the control panel to turn off the machine himself without taking the time to walk around the machine to the control panel side. If Builders Masonry had provided some safety mechanism such as a shut off switch on Pate's side of the machine, Pate would have used it to turn off the machine prior to clearing the jam. Thus, the negligence of Builders Masonry was a substantial factor in causing Pate's injury, and is hence one proximate cause of the accident.

### 3. Apportionment of Responsibility Under I.C. § 6–1404.

62. The Idaho Supreme Court has held that identical considerations govern the apportionment of responsibility for negligence and strict liability cases under the IPLA. *Vannoy,* 111 Idaho at 542.

63. The Court hereby incorporates by reference the Conclusions of Law contained in paragraphs 35 through 53 above.

64. The Court hereby finds that Pate is 70% responsible for his injuries, Columbia is 15% responsible, and Builders Masonry is 15% responsible.

### D. Useful Safe Life.

■■■ 65. The IPLA contains a statute of repose in I.C. § 6–1403(2) which provides that "[i]n claims that involve harm caused more than ten (10) years after time of delivery, a presumption arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by clear and convincing evidence."

66. There is a "hidden defect" limitation to the statute of repose contained in I.C. § 6–1403(2)(b)4. This provision provides that the statute of repose does not apply if "the injury-causing aspect of the product that existed at the time of delivery was not discoverable by an ordinary reasonably prudent person until more than ten (10) years after the time of delivery...."

67. In upholding the constitutionality of the statute of repose, the Idaho Supreme

Court stated that "[a]lthough the Idaho [statute of repose] provides no specific criteria, example or guidelines to determine the 'useful safe life' of a product, ... such terms can be interpreted as taking their ordinary, contemporary, or common meaning." *Oats v. Nissan Motor Corp. in U.S.A.,* 126 Idaho 162, 168, 879 P.2d 1095, 1101 (1994).

 68. The Idaho Supreme Court has held that "clear and convincing evidence means a degree of proof greater than a mere preponderance." *Matter of Jenkins,* 120 Idaho 379, 383, 816 P.2d 335, 339 (1991). The United States Supreme Court has held that the clear and convincing standard is something less than the criminal standard of beyond a reasonable doubt. *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The clear and convincing standard therefore requires more than a preponderance, and less than beyond a reasonable doubt.

69. The Idaho Supreme Court has listed factors "that are especially probative in determining whether a product's useful safe life has expired:

(A) The amount of wear and tear to which the product had been subject;

(B) The effect of deterioration from natural causes, and from climate and other conditions under which the product was used and stored;

(C) The normal practices of the user, similar users, and the product seller with respect to the circumstances, frequency, and purposes of the product's use, and with respect to repairs, renewals, and replacements;

(D) Any representations, instructions or warnings made by the product seller concerning proper maintenance, storage, and use of the product or the expected useful safe life of the product; and

(E) Any modification or alteration of the product by a user or third party."

*Olsen v. J.A. Freeman Co.,* 117 Idaho 706, 713, n. 6, 791 P.2d 1285, 1292 (1990).

70. The date of delivery here was 1976, and the injury occurred more than ten years after that date. The statute of repose therefore sets up a presumption in this case that the useful safe life of the S32 Splitter had expired at the time of the accident. To rebut that presumption, Pate must establish by clear and convincing evidence that the Splitter's useful safe life had not expired by the date of the accident.

71. In an attempt to satisfy his burden, Pate offered the deposition of Gordon Eigsti, Columbia's domestic sales manager. He testified that "[w]e've got splitters in the field that were probably 35 years old." When asked if those machines were still operating, he responded, "[s]ome of them. Depends on how well they're maintained." *See,* Deposition of Eigsti at pp. 18–19. When asked whether "it's not unusual" for an S32 Splitter to "continue operation more than 20 years," Eigsti responded, "[y]eah, I suppose it could." *Id.* at 19. But when asked again if "it's unusual," he answered, "I have no idea how many S32s are still out there operating. I really don't know." *Id.* at 19.

72. Steve Mason testified that the S32 Splitter was operated at Builders Masonry about 6 to 8 days a year.

73. Peter Schwalje, Columbia's expert, testified that the Splitter could last indefinitely if parts are replaced when they wear out, but if regular maintenance is not performed, the machine might not last six months.[3]

74. Eigsti's deposition established that "a lot fewer" than 33 S32 Splitters were sold per year in the 1976 time frame. *Id.* at p. 18,

---

**3.** Schwalje's testimony at trial was consistent with his deposition testimony on this particular issue of useful safe life. *See,* Deposition of Schwalje, at p. 92, ll. 1–9. But much of Schwalje's testimony at trial had not been discussed in his deposition. This was understandable because Pate's counsel had not provided the theories of their expert, Dr. Gill, to Schwalje *prior* to Schwalje's deposition. But Pate's counsel did provide Dr. Gill's theories in part during the Schwalje deposition and shortly thereafter. Co-

lumbia had ample time prior to trial to file a supplemental report discussing Schwalje's rebuttal of Dr. Gill's theories as required by Federal Rule of Civil Procedure 26(e)(1). But Columbia never filed the supplemental report, and hence Schwalje's testimony that was not previously revealed in either his initial report or his deposition testimony was not considered by the Court. As previously discussed, this same ruling applies to Dr. Gill, who also attempted to testify at trial

ll. 15–18. On this issue, Pate introduced exhibit 4 which contains two lists. The first list shows 13 S32 Splitters, all more than 10 years old, still in operation as of July 20, 1995. That list shows 1 Splitter made in 1972; 3 made in 1973; 2 made in 1975; 2 made in 1976; 3 made in 1979; and 2 made in 1980. This list includes companies from California to New York. The last page of exhibit 4 shows that a total of 10 Splitters that are at least 15 years old may still be operating in California, Idaho, Washington, Utah and Colorado.

75. Any machine could last forever if parts were replaced when they wore out. This does not mean that the "useful safe life" of the machine is indefinite. The Plaintiff must show that machines with regular—not extraordinary—maintenance last beyond the ten year limit. Schwalje's testimony set out above is of little help on this issue.

76. Pate has not submitted clear and convincing evidence on this issue. The evidence is quite ambiguous. For example, there may have been 15 S32 Splitters manufactured each year between 1972 and 1980. That would mean a total of 135 Splitters were made between 1972 and 1980. Exhibit 4 shows that 13 of those Splitters—or about 10%—are still in operation as of 1995. That means 90% of those Splitters did not last until 1995. These figures tell us very little. For the 90% of Splitters that did not last until 1995, there is no indication how long in fact those Splitters operated. All the figures really "show" is that 10% of the Splitters may be operating more than 15 years. And even that conclusion is based on a guess that 15 Splitters were made each year between 1972 and 1980.

77. In fact, the evidence says nothing about the number of Splitters built in the years around 1976 other than that the total was "a lot fewer" than 33 per year. Does that mean 20 per year? Or 5 per year? It is unclear from exhibit 4 whether the machines listed there are actually still operating. No inventory of these machines was taken to determine whether they are still in use. While the S32 Splitter was only used 6 to 8 days a year by Builders Masonry, the splitting of 90 pound concrete blocks is no easy

task. In addition, the storage of a machine over 16 years can have many detrimental effects.

78. The Court finds that Pate has not carried his burden of presenting clear and convincing evidence rebutting the presumption, arising under I.C. § 6–1403(2)(a), that the useful safe life of the S32 Splitter had expired by the date of his accident.

79. The Court further finds that the "hidden defect" exception to the statute of repose does not apply since there were no hidden defects in this case.

### III.

### CONCLUSION

1. In accordance with these Findings of Fact and Conclusions of Law, the Court finds for the Defendant and against the Plaintiffs and shall issue a separate Judgment, as required by Federal Rule of Civil Procedure 58, setting forth the ruling of the Court.

---

on matters not previously discussed in either his

Rule 26 report or his deposition.